BROWN v. LENNANE.[1]

1. MASTER AND SERVANT—INJURIES TO SERVANT—ASSUMED RISK
—OBEYING ORDERS.

A servant did not, as a matter of law, assume the risk of injury
from the fall of the frozen crest of a pile of sand from which
he was shoveling, where, on his objecting to working at that
particular place because of that danger, the master's vice
principal ordered him to do the work on pain of discharge
and at the same time assured him that he had tested the pile
and that it was safe. HOOKER, J., and GRANT, C. J., and
OSTRANDER, J., dissenting.[2]

2. SAME—VICE PRINCIPAL—EVIDENCE—SUFFICIENCY.

In an action for injuries to a servant, evidence examined, and
held, sufficient to show that defendant's superintendent in
charge of the work upon which plaintiff was injured was a
vice principal. HOOKER, J., and GRANT, C. J., and OSTRAND-
ER, J., dissenting.

Error to Wayne; Murphy, J. Submitted June 18,
1908. (Docket No. 25.) Decided November 30, 1908.

Case by Joseph Brown against William E. Lennane
and John Lennane, copartners as Lennane Brothers, for
personal injuries. There was judgment for defendants
on a verdict directed by the court, and plaintiff brings
error. Reversed.

*Washington I. Robinson*, for appellant.

*Brennan, Donnelly & Van De Mark*, for appellees.

BLAIR, J. Plaintiff, a man of mature years, was in-
jured by reason of the frozen crest or crown of a sand pile
falling upon him, and brought this action to recover dam-
ages therefor.

---

[1] Rehearing denied July 15, 1909.

[2] As to effect, on assumption of risk, of assurance of safety given
by the master or a coservant, see note to *McKee* v. *Tourtellotte*
(Mass.), 48 L. R. A. 542.

Plaintiff testified, omitting the curses with which he claims Mr. Brennan's statements were interlarded, as follows:

"I had a conversation with Mr. Brennan before the accident. It might be a minute before. I don't know what it was exactly. I don't remember it all. I remember part of it. He came rushing over. I was taking the sand from the side. Mr. Brennan came rushing over, and he says, '—— —— it, Brown, you are scraping there like an old woman. —— ——, why don't you come over here, and take it where it is plentiful?' And he started shoveling the sand from under this crown, and at the same time he motioned to the other man to come over with him to the center, and the man pulled his wheelbarrow over, and I says: 'Mr. Brennan, ain't that crown liable to cave in on us fellows?' He says: 'No, —— —— it, no; that is as firm as masonry. That is as strong as stone. —— —— that is perfectly safe. —— —— it, I was up and around there. That is perfectly safe. I want the sand over, Brown.' And I lifted the shovel and was shoveling the sand, and Mr. Brennan comes towards me, and I says: 'Mr. Brennan, did you expect two men to do five men's work?' And he says, '—— —— you, Brown, I don't want any back talk. —— ——, I want the sand over. I don't want any back talk at all. You will be the next one to get out of here. I will fire you.' I was working then, I was shoveling sand, and I didn't talk back any more. He was still digging in from the same place, and filling up his wheelbarrow. The other man was doing this. Brennan ordered him over. He swore at him, and told him to come over where the sand was plentiful. I started to dig there. I was digging only a few seconds after he told me about this being safe. I was shoveling the sand into the wheelbarrow. Brennan had shoveled about two-thirds of the wheelbarrow full, and I shoveled probably three, four, five, or probably six shovelfuls of sand after that. My colaborer was still digging at the sand from the same place and throwing it into his own wheelbarrow. After I got through, I turned right around like this, and I catched the handles of the wheelbarrow and lifted it up to run away with it, and the crash came right down on me. The frozen sand came down from this overhead, hanging over. This hung over probably three or four or five feet."

The trial judge directed a verdict for the defendants upon the ground that plaintiff assumed the risk, and plaintiff brings the record to this court for review upon writ of error.

We think that the case is distinguishable from *Toomey* v. *Steel Works*, 89 Mich. 249, *Livingstone* v. *Plate Glass Co.*, 146 Mich. 236, and other Michigan cases cited by counsel for defendants, in that in the case at bar defendants' vice principal vehemently and with oaths ordered plaintiff to do the work, on pain of losing his job, and at the same time informed him substantially that he had been up on top of the sand pile and tested its safety, and that it was actually safe. This is more than the mere expression of an opinion or than a statement apparently based upon facts equally open to plaintiff's visual observation. It was a representation that the superintendent had actually gone upon the sand pile, tested it, and found as a matter of fact that it was safe. We do not think it can be said, as a matter of law, that the plaintiff assumed the risk, under such circumstances, in obeying the orders for a reasonable time. Throughout the trial of the case, Mr. Brennan was apparently treated as defendants' superintendent and representative. And no claim appears to have been made that he was a fellow-servant of plaintiff. The trial judge charged the jury:

"That, for the purpose of this case, Mr. Brennan stood, upon that day, toward the plaintiff in the position of the plaintiff's employer. He had the power to hire and discharge men and give directions, and was in control over them, so that whatever Mr. Brennan did upon that day may be taken to be the act of the defendants themselves."

The correctness of the charge in this respect is not called in question by counsel for defendants, and in my opinion the record supports it. Plaintiff testified:

"There were five of us wheeling sand, all to the same place, under the direction of Superintendent Brennan. Superintendent Brennan had charge of the cement work on the overhead crossing, the piers, and abutments and para-

pet walls that were put up out of concrete. * * * Mr. Brennan hired me and he paid me. * * * Mr. Brennan had charge of the carpenters, and he directed them."

Mr. Brennan testified:

" I don't know that Brown claims that it was through my carelessness and negligence as superintendent of Lennane that he was injured. I don't think so. I had charge of 400 or 500 men. * * * The work was in two separate sections. I had charge of the concrete construction work, and Mr. Walker had charge of the grade work, and, when I would want to borrow a few men, I would take them from his gang, and, if he wanted to borrow a few men, he would take them from my gang, and the men appear on both books. Sometimes they might appear on this for 45 hours or on Mr. Walker's for the balance of the date, according to how we kept them, but the majority of these men were with me from the day I commenced the work till I ended it. I ended it some time in June, if I am not mistaken. I went to Des Moines, Iowa, to take charge of a construction job there. I haven't seen any of these men since I left. I hired these men and Mr. Walker hired them. If I borrowed men from Mr. Walker, I had the men for the concreting. I had the men for the cement construction. They left it entirely to me, and sometimes they would come around and say, 'I want you to discharge a man,' and I had to go under their supervision."

Judgment reversed, and new trial granted.

MONTGOMERY, MOORE, and McALVAY, JJ., concurred with BLAIR, J.

HOOKER, J. (*dissenting*). This case should be ruled by that of *Livingstone* v. *Plate Glass Co.*, unless the fact that defendants' superintendent commanded plaintiff to go into a place of danger, and assured him of its safety, distinguishes it from that case in principle. The plaintiff in the present case was a man 46 years old and of experience in mechanics. As was said in the *Livingstone Case*:

" He must be held chargeable with the knowledge that a sand pile lying out of doors was frozen, and that digging

into such pile would remove the support from the frozen crust."

He did know it and objected to working under it for that reason; but the superintendent told him it was safe and ordered him to get at work, and he did so. There is nothing to indicate that he did not know as much about the danger after as before. See *Welch* v. *Brainard,* 108 Mich. 38; *Ritzema* v. *Brick Co.,* 152 Mich. 75. In such a case one assumes the risk of the dangerous employment which he undertakes. *Anderson* v. *Lumber Co.,* 47 Minn. 128; *Kean* v. *Rolling Mills,* 66 Mich. 277; *Soderstrom* v. *Lumber Co.,* 114 Mich. 83; *Rohrabacher* v. *Woodard,* 124 Mich. 125. These cases hold:

"One cannot continue to operate a machine which he knows to be dangerous simply upon the assurance of his employer that it is not, if he has just as much knowledge of the danger * * * as his principal has."

See, also, *Reese* v. *Clark,* 146 Pa. 465; *Perschke* v. *Hencken,* 44 N. Y. Supp. 265; *Linch* v. *Manufacturing Co.,* 143 Mass. 206; *Kinzel* v. *Railway Co.,* 137 Fed. 491, 70 C. C. A. 73 (69 L. R. A. 757); *Chicago Great Western R. Co.* v. *Crotty,* 141 Fed. 913, 73 C. C. A. 147 (4 L. R. A. [N. S.] 832).

There is another reason for affirming this judgment. A right to recover was and is claimed upon the theory that Brennan was the vice principal or alter ego of the defendants. There is nothing in the case tending to show it. The testimony of plaintiff was that:

"There were five of us wheeling sand, all to the same place, under the direction of Superintendent Brennan. Superintendent Brennan had charge of the cement work on the overhead crossing, the piers and abutments, and parapet walls that were put up out of concrete. That was made up partially of this sand and crushed stone and cement and water. Mr. Brennan hired me and paid me. * * * Brennan had shoveled about two-thirds of the wheelbarrow full, and I shoveled probably three, four, five, or probably six shovelfuls of sand after that. * * * I don't know where Mr. Brennan was when this happened,

probably on the street.   I know Mr. Walker and have known him for probably 16 or 18 years.   He was working for Lennane Bros., too.   Taking his word for it, he was manager."

Brennan testified:

"I was employed by Lennane Bros. in 1903 and in 1904 building the Michigan avenue subway, track elevation, where they were separating the grade of Michigan avenue and another street, Park and Lovett."

Duncan testified:

"I had been working for Lennane Bros. before Mr. Brown.   At that job that he went down to see Mr. Walker, and he introduced him to Mr. Brennan, the superintendent, and Mr. Brennan gave us a job dumping it in the mixer, not wheeling it.   *   *   .*   Mr. Walker went and got an ambulance.   I did not go in the ambulance. * * * I was there when they took him out to the ambulance.   I helped to fetch him, when Dr. Milligan was there.   Mr. Walker sent me after Dr. Milligan.   Mr. Walker was working for Lennane.   When Mr. Walker came down there when Mr. Brown was carried in was when he told me.   This was at Brown's house.   He told me to go and get the physician.   I went over to the drug store to see if I could find out where he was.   He was not home in the office, and I came back and told Mr. Walker that I could not find him.   He was out, and he was down about the middle of the block on Congress street with a horse and buggy, and we happened to strike him, and then we called him in, or Mr. Walker did.   Mr. Walker knew him, and went down.   Mr. Walker brought Dr. Milligan.   *   *   * I knew Mr. Walker had sent for Dr. Milligan to come and see him, and I followed his instructions.   *   *   ·* Brown was hired just about the same time I was.   Mr. Brennan told us to come to work the next morning. * * * We went up there to Lennane Bros. together to get a job. We saw Mr. Walker first.   Mr. Brown had known Mr. Walker.   He had worked for him.   Brown is a stonecutter.   I am a stonecutter.   We had worked in the same stone yard.   Mr. Walker introduced us to Mr. Brennan. We were glad to get anything we could.   He put us on the platform.   *   *   *   Mr. Walker went in the ambulance, but I went ahead of him to notify the sister.   Mr. Walker told me to go and notify his sister."

The plaintiff testified further:

"I worked for Walker. I have worked on two streets in this city for Walker."

From the foregoing, which is all of the testimony that we have found upon the subject, it is inferable that defendants had a contract for erecting overhead crossings in Detroit, that Walker was their manager, and that Brennan was the superintendent of the construction of the cement piers. Nothing indicates that he had general charge of defendants' work or that he was more than a construction boss, and, if so, he was a fellow-servant under the rule laid down in many cases. *Guest* v. *Illuminating Co.*, 150 Mich. 438; *Younggren* v. *I. Stephenson Co.*, 150 Mich. 488; *Corey* v. *Iron Co.*, 151 Mich. 558, where the authorities are collected. If it can be said that the testimony shows that Brennan was called a superintendent, it does not follow that he was a vice principal, and the jury should not have been allowed to so find upon this record. It would, at most, have been a guess. The burden of proving that he was a vice principal was upon the plaintiff, and he failed to prove it; the evidence being equally if not more consistent with the claim that he was a fellow-servant.

The judgment should be affirmed.

GRANT, C. J., and OSTRANDER, J., concurred with HOOKER, J.