BROUSEAU v. KELLOGG SWITCHBOARD & SUPPLY CO.[1]

1. MASTER AND SERVANT — ASSUMPTION OF RISK — IMPLIED CONTRACT.

The principle of assumed risk by the servant rests upon the ground that it is an implied contract by the employé to assume the risk of all dangers obviously incident to his employment.

[1] Rehearing denied December 10, 1909.

2. SAME—RISKS NOT ASSUMED—PROMISE TO REMEDY NEGLECT.

In Michigan a promise by the employer to remedy a danger, of which his servant complains, relieves the latter of obvious risks in both simple and complicated machinery, tools, and implements.

3. SAME—PROMISE TO REPAIR OR REMEDY DEFECT—SUFFICIENCY.

By complaining to his employer that a pair of tongs used by the plaintiff in loading poles on a car were so dull that the poles could not be safely held, and receiving a reply that there was no time to have them sharpened then, and that plaintiff should use them until they could be sharpened or replaced, a question of fact for the jury was raised as to the sufficiency of the assurance to relieve the servant of the assumption of risk.

4. SAME—CONTRIBUTORY NEGLIGENCE.

The fact that plaintiff continued to use the tongs although the poles continued to slip after the complaint was made, does not show contributory negligence *per se*, where it was inferable that he believed he could escape injury, and where the tongs were subsequently used by other servants without injury.[1] BROOKE, GRANT, and McALVAY, JJ., dissenting.

Error to Delta; Stone, J. Submitted April 16, 1909. (Docket No. 73.) Decided October 4, 1909.

Case by Walter Brouseau against the Kellogg Switchboard & Supply Company for personal injuries. A judgment for defendant on a verdict directed by the court is reviewed by plaintiff on writ of error. Reversed.

*Albin W. Norblad* (*Newton C. Spencer*, of counsel), for appellant.

*I. C. Jennings* (*E. C. Eastman*, of counsel), for appellee.

BLAIR, C. J. Plaintiff brought this action to recover damages for injuries received by him while assisting in

---

[1]As to rights of servant continuing work on master's promise to remove a specific cause of danger, see note to *Illinois Steel Co.* v. *Mann* (Ill.), 40 L. R. A. 781.

the loading of poles upon a car in defendant's assembling yard. The poles were loaded onto the cars by means of a derrick.

"There is a boom hanging over the center of the car and a cable running along it. At the end of the boom is fastened a pulley, in which the cable passed, hanging down from the side of the car, and the end is fastened to a pair of tongs; the other end of the cable being fastened to the whiffletree of the horses. It was my duty to take the tongs and hook them to the poles, and I would give the word to the teamster to go ahead and the pole would go to the top of the car, which was a flat car. The pole would go up to 12 feet. They were 8 inches at the top end and 15 to 18 at the butt end. I would fasten the tongs as near the center as I could judge, to balance it."

On the afternoon of February 29, 1908, a pole which plaintiff had hooked the tongs onto fell while being raised, and caused the injury complained of. The negligence charged is that the defendant, disregarding its duty to furnish a suitable and proper pair of tongs, furnished him with tongs that were unsuited to the work, in that the points were dull and would not hook into and properly hold the poles; that plaintiff notified defendant's superintendent of the defective condition of the tongs, and continued his work upon defendant's promise to repair them or furnish a new pair.

The court directed a verdict for defendant, on the ground that plaintiff assumed the risk of using so simple a tool as the tongs, and was also guilty of contributory negligence.

"It is a simple contrivance. I do not think there was any duty with so simple a contrivance as this on the master to inspect them to see that their condition was proper. And it does not appear from the testimony in this case—which I have scrutinized pretty closely—that there was any promise to repair, or anything equivalent to a promise to repair. It is rather the opposite of that. The master didn't say he would repair. The plaintiff claims he said, 'No,' they didn't have time to repair it, to go ahead and use this tool until they could get it sharpened, or get

another pair. I do not believe this is equivalent to a promise to repair which would naturally have misled the plaintiff. But I think when he continued to use that tool, knowing its condition, so apparent and simple as it was, that he was guilty of contributory negligence, and that he also assumed the risk."

Plaintiff brings the record to this court for review upon writ of error. He testified, among other things, as follows:

"In the afternoon we started loading smaller poles. We did not use the same pair of tongs that we used in the morning. I went and got them on the gondola car on the northwestern spur, where we had been loading the day before. * * * I had used them about a half an hour on the morning of the 28th, loading shingle bolts. I had some trouble with the tongs at that time. They slipped from the shingle bolts. They were dull. At noon on the 29th I had a talk with Mr. Enfield regarding these tongs. Well, when I went and got the tongs, I was sent for the tongs, and I brought them back, and I told him these tongs were as dull as the ones we had been decking ties with when we started to load shingle bolts on the morning of the 28th. * * * He told me they were not any duller. They were no worse. I asked him if he could have them sharpened. He says, 'No; we haven't any time.' * * * Mr. Enfield replied to me that he didn't have time to sharpen the tongs then. He told me to go ahead and use them until he could have them sharpened, or get another pair. That was about 1 o'clock, and I worked with the tongs until 3 o'clock, when I was hurt. * * * Several of them had slipped owing to the tongs being dull; and, when sending up a pole, I generally watched it until the man on the car got his hand on it. Then I would turn and get another one ready to send up. I did so in this case, and turned around to get another pole to send up, and, without any warning at all, a pole came down and hit me on the ankle, and knocked me down. It struck me on the left foot about 3 o'clock in the afternoon. I did not see the pole coming. I was getting another pole to send up. I did not know where the pole was at the time it fell. It was in the air. It was part of my duty to get another pole ready. The pole was in Ole Lund's hand on the top of the car at the time it slipped. * * * The top of the

poles that were being loaded was about nine feet from the ground. There was about three feet space in the immediate vicinity where I was working that I could move in. The rest of the space was occupied by poles and the car. * * * The tongs were dull, because the timber slipped with them. I had seen it slip before. I could see that they were dull. I had had experience enough loading poles to tell whether they were dull or whether they were sharp. * * * I had seen the same shingle bolt slip four or five times from these tongs. It would slip out of the tongs. The shingle bolts were all the way from eight to about sixteen inches. About four or five poles had slipped out of the tongs before the one that struck me. These had slipped out that afternoon between 1 and 3 o'clock. We would have to have the horse back up and hitch on again, put the tongs on again. The same pole slipped more than once. One pole slipped twice, as I remember. * * * It was necessary for me to stand under the pole when I got another one ready, after the one had gone up. There was three feet of space that I could move in. It was necessary for me to stand under the pole, because there wasn't room for me to get away. I couldn't back up. I could go towards the end of the car. I could have gone toward either end of the car. * * * I could not have performed my duty in any other way than I did without delaying it. If I had stepped to the south, I would still be under the pole, unless I crawled under the car. I could not have gotten another pole ready and performed my duty, if I had stepped to the side as Mr. Eastman suggested. I would have to keep the whole crew waiting."

The principle of assumed risk rests upon the ground that it is an implied contract between the employer and the employé that the employé shall assume the risk of all dangers obviously incident to his employment, and is independent of the negligence of the employer or the contributory negligence of the employé. *Bradburn* v. *Railroad Co.*, 134 Mich. 575 (96 N. W. 929); *Swick* v. *Cement Co.*, 147 Mich. 454 (111 N. W. 110); *Sipes* v. *Starch Co.*, 137 Mich. 258 (100 N. W. 447).

If the employé, after notifying the employer of a dangerous defect, is induced to continue his work by the em-

ployer's promise to remove the defect, his implied contract to assume the risk of such defect is suspended for a reasonable time, and the employer impliedly contracts to assume the risk of injury therefrom himself. Regarding the employer's promise to repair as a temporary assumption of the risk on his part, it appears to us illogical to hold that the employé is no longer charged with the *obvious* risks of a complicated machine, but still assumes the *obvious* risks of a simple implement. We deem it more in accordance with the principle upon which the doctrine of assumed risk rests in this State to hold that it applies alike to simple tools and complicated machinery. See 1 Labatt on Master & Servant, pp. 1223, 1224; *Louisville Hotel Co.* v. *Kaltenbrun,* 26 Ky. Law Rep. 208, 669 (80 S. W. 1163, 82 S. W. 378); *Roux* v. *Lumber Co.,* 85 Mich. 519 (48 N. W. 1092, 13 L. R. A. 728, 24 Am. St. Rep. 102); *Lyttle* v. *Railway Co.,* 84 Mich. 289 (47 N. W. 571); *Brown* v. *Lennane,* 155 Mich. 686 (118 N. W. 581).

We do not think it should be held, as a matter of law, that the directions of the master's representative did not amount to a promise to repair, upon which the plaintiff had a right to rely. Neither can it be affirmed, as a matter of law, that plaintiff was guilty of contributory negligence without entirely depriving him of the protection afforded by the master's temporary assumption of the risk. It is clear that, if the mere use of the dull tongs under the surrounding circumstances of peril constituted contributory negligence, the rule absolving plaintiff from the assumption of the risk which his employer had agreed to assume for the time being would be wholly valueless, since the rule only applies where the danger is not so imminent that an ordinarily prudent man would not assume the risk itself. *Mann* v. *Railway Co.,* 124 Mich. 641 (83 N. W. 596).

If plaintiff was guilty of contributory negligence, therefore, it was because he went on using the dull tongs which the employer requested him to continue using. Accord-

ing to his testimony, he used them with proper care, in reliance upon the orders and promises of his employer.

The plaintiff, "it may reasonably be assumed, would to some extent have his fears allayed by the commands of a master, whose duty it would be not to send him into danger, and who might therefore be supposed to know, when he gave the command, that the dangers were not such or so great as the servant had apprehended. * * * Moreover, the assurances remove all ground for the argument that the servant, by continuing the employment, engages to assume its risks. So far as the particular peril is concerned, the implication of law is rebutted by the giving and accepting of the assurance; for nothing is plainer or more reasonable than that parties may and should where practicable come to an understanding between themselves regarding matters of this nature." Cooley on Torts, pp. 556, 559, quoted with approval in *Roux* v. *Lumber Co., supra.*

It is difficult to believe that any employer would induce an employé to continue a service which he believed would probably result in his serious injury. It is obvious that the plaintiff believed that, notwithstanding the apparent danger, he could escape injury in continuing his work. He had used the tongs without injurious results from their slipping up to the time of his injury.

Defendant's witness Lund testified:

"These tongs were used afterwards in the same kind of business. We finished the car after he got hurt. We did not stop to sharpen them. We kept right on going. * * * After Brouseau was hurt, I think it was Mr. Enfield himself who hooked the tongs into the poles, if I am not mistaken."

That no poles slipped afterwards. Mr. Enfield, the superintendent, testified:

"I observed the other men when they were loading the car to see how they were doing their work. I didn't see any poles slip on the tongs while Brouseau was at work there. After Brouseau was hurt, they may have been used off and on. We didn't load many poles. Maybe a car a month or so; perhaps not that. I mean a car load a month, about, since he was hurt. These tongs have

worked in the meantime satisfactorily. There has not been any slipping of poles or accident from the use of these tongs that I know of. * * * Since the accident I have not been looking at every pole that went up, but in a general way I have, and I would say that there has been no slipping through the tongs. These tongs have never been sharpened since we have had them, that I know of."

In the light of the testimony as to the results attending the use of the tongs before and after the plaintiff's injuries, I do not think that it should be determined, as a matter of law, that the danger was so imminent and great that it was sheer recklessness on the part of the plaintiff to obey the directions of his employer, relying upon his assurances.

The judgment is reversed, and a new trial granted.

MONTGOMERY, OSTRANDER, HOOKER, and MOORE, JJ., concurred with BLAIR, C. J.

BROOKE, J. (*dissenting*). A sufficient statement of the facts in the case, and of the circumstances surrounding the plaintiff at the time of his injury, is found in the opinion of my Brother BLAIR.

The plaintiff's testimony shows that the tongs were of the greatest simplicity, and that they were obviously dull; that he had used them the day before he was hurt loading shingle bolts, when they frequently slipped; that, after his protest to the master, he continued to use them from 1 o'clock until 3 o'clock, when he was injured. During this interval four or five poles slipped from the tongs, one of them slipping out twice. Under these circumstances, we are asked to say that it becomes a question of fact for the determination of the jury whether or not the plaintiff was guilty of contributory negligence in continuing to use the defective appliance. I believe that the plaintiff should be held to be guilty of contributory negligence, as a matter of law. He was obliged to stand in a narrow space between the car and the pile of poles he was loading, with scant opportunity to avoid a falling pole by stepping aside.

Yet, by great good fortune, he had escaped four or five such during the two hours preceding the accident. He continued to use the dull tongs, and was injured. Conceding that the promise to repair was made by the master and relied upon by the plaintiff, it is not true that every promise to repair by the master relieves the servant from the assumption of risk or from the effects of his own negligence.

In *Hough* v. *Railway Co.*, 100 U. S. 213, the court laid down the rule, in effect, as follows:

" If the nature of the defect is not such as to impress a prudent man with a feeling or consciousness of imminent danger, then the master is liable."

In *Mann* v. *Railway Co.*, 124 Mich. 641 (83 N. W. 596), this court said:

"Was the condition which presented itself to plaintiff so obviously a dangerous one that an ordinarily prudent man would not, even in reliance on the promise of defendant to repair, attempt what he attempted ? * * * Nor do we think we should hold, as matter of law, that the course of the plaintiff was so reckless as to preclude him from asserting a reliance on the promise to repair. The new machine had not been set in motion by escaping steam prior to the time of the accident, and the danger was not so obvious that we can characterize the plaintiff's attempt to tighten the nut as reckless."

Again, in *Wheaton* v. *Coal Co.*, 151 Mich. 100 (114 N. W. 853), Mr. Justice Montgomery, in discussing a pair of ice tongs (similar in construction to those in the case at bar), said:

" In fact, there is nothing about a pair of ice tongs that would seem to require expert testimony to instruct either a court or a jury. Both appeared to be equally sharp at the points. The Holland tongs curved a little less sharply than the Wheaton tongs, so-called, and it resulted that they would not grasp with equal efficiency a large cake of ice. In other words, the capacity of these tongs to grasp a cake of ice was limited. But it was a perfectly obvious limitation. Any one using such a tool would be able to know at a glance whether a sufficient hold had been se-

cured upon the ice to support its weight, and any insistence on making use of the tongs without having a sufficient hold on the ice to support the weight was plainly negligence."

So, in the case at bar, the fact that the tongs would not grasp the poles sufficiently to sustain their weight was a perfectly obvious one, and one, too, which had received many illustrations for the plaintiff's benefit before his injury. His continued insistence in making use of them in the face of his experience was an act of the plainest negligence. See, also, *Illinois Steel Co.* v. *Mann*, 170 Ill. 200 (48 N. E. 417, 40 L. R. A. 781, 62 Am. St. Rep. 370), and notes; *Gunning System* v. *Lapointe*, 212 Ill. 274 (72 N. E. 393).

The judgment should be affirmed.

GRANT and MCALVAY, JJ., concurred with BROOKE, J.