ASPLUND v. CALUMET & HECLA MINING CO.

1. MASTER AND SERVANT—TRIAL—CHARGE.

On the trial of an action for injuries sustained by a miner in defendant's employ, the court did not err in stating to the jury the claim of plaintiff in detail, in part as follows:    That plaintiff claimed he was working in a stope with a partner; that the mine was working a day and night shift; that the plaintiff and another employee were running a drilling machine, and the rock was being excavated from between other strata of stone, which were known as the hanging wall and foot wall; that it was not part of plaintiff's duty to put in timbers and if they considered such work necessary to support the wall the men applied to the shift boss who was the proper person to cause the timbers to be put in by workmen employed for that purpose; that plaintiff called the attention of the shift boss to a point that looked dangerous and told the boss that plaintiff thought it ought to be timbered; that the place, in fact, needed support, and the boss who examined it told plaintiff he would send men to do it either that afternoon or the next day and directed plaintiff not to bar down any more rock from the place because they would make more descend; that on the following Monday when plaintiff went to work he again complained of the danger to the shift boss who informed him that he would have the place timbered as soon as possible and for plaintiff to go to work, he would be all right; the plaintiff relying on his promise and assurance, etc., the court also stating the claim of defendant and informing the jury that they were the sole judges of the facts.    The charge was not improperly argumentative.

2. TRIAL—LEADING QUESTIONS.

No reversible error was committed in permitting his attorney to ask leading questions of the plaintiff who was a foreigner and understood English with difficulty.   The ruling was a matter for the discretion of the trial court.

177 MICH.—34.

3. MASTER AND SERVANT—MINES AND MINING.

Although a specified danger is patent and is known to the
servant, the master may be liable for injuries resulting
therefrom if he has lulled the servant into a sense of
security by insisting that there was no danger, or prom-
ising to remedy it. And, accordingly, if the injured em-
ployee regarded the hanging wall as so dangerous that
it needed timbering to make it safe, but did not regard
the danger as so imminent as to justify him in dis-
regarding the assurance and direction of his superior
servant, he was entitled to recover.[1]

Error to Houghton; Cooper, J., presiding. Sub-
mitted June 20, 1913. (Docket No. 68.) Decided
November 3, 1913.

Case by Victor Asplund against the Calumet &
Hecla Mining Company for personal injuries. Judg-
ment for plaintiff. Defendant brings error. Af-
firmed.

*Allen F. Rees,* for appellant.

*Le Gendre & Driscoil,* for appellee.

MOORE, J. The plaintiff is a miner, and while at
work in the Osceola lode of the defendant's mine he
was injured by the falling of a considerable mass of
rock. His thigh was broken, and he received other
injuries. After plaintiff had put in all his evidence,
defendant putting in no evidence, a directed verdict
was requested on the part of the defendant. This re-
quest was denied. The case was submitted to a jury,
which returned a substantial verdict in favor of the
plaintiff. The case is brought here by writ of error.

---

[1] As to continuing work on master's promise to remove a
specific cause of danger, see note in 40 L. R. A. 782.

The question of assurance of safety by master or coservant
is treated in notes in 48 L. R. A. 542; 23 L. R. A. (N. S.) 1014;
and 30 L. R. A. (N. S.) 453. And for effect of master's assur-
ance as to obvious dangers of employment, see note in 4 L. R.
A. (N. S.) 971.

The errors assigned make it necessary to quote freely from the charge of the court, which we do as follows:

"The plaintiff claims that he was working as a miner in a stope with a partner. That the mine worked day and night shift, and plaintiff and his partner were running what is known as a drilling machine. That the copper rock in the mine was excavated from between other strata of stone or rock, the upper of which was known as the hanging wall, and the lower of which was known as the foot wall. The place where the copper rock was is known as the vein and is about nine feet wide. That the shift boss was in full charge of the underground workings of the mine. That the company had special gangs employed in the mine for the purpose of putting in timber wherever necessary, which gangs were known as the timbermen. That it is no part of the duty of the plaintiff or his partner to put in timbers, and the only thing they could do in case they deemed timber necessary or advisable in any place was to apply to and notify the shift boss, who was the proper person to apply to, and that it was the shift boss' duty, and he had authority from defendant, to cause timbers to be put in wherever necessary or advisable for the safety of the men, and that the shift boss is the proper person to whom to report any defects or inefficiencies or dangerous or unsafe place in the mine.   *   *   *

"That, at the time of the occurrences of his injuries, the plaintiff was working in the first stope north of No. 15 shaft on the fourth level, at a place above about 30 feet up from the level, called the point. That, on Friday next prior to the day of his injuries, he and his partner were working in the upper stope in the level next to the first stope, above the place where he was working when injured, and were squaring this upper stope up and bringing it as far as the first stope. That this upper stope was just about finished and was holed to the third level; that is, a hole or opening had been made from this upper stope upward and through to the third level. That on this Friday they were told by the shift boss, under whose charge they were, that, when they finished the work of squaring up at the place they were, they were to

go down and work at the point in the first stope. That on this upper stope below the place where they were working on Friday, but above the place where they would have to work when they went down to work in the first stope, was a belly of ground that did not look safe to the plaintiff, and the plaintiff on this Friday called the shift boss' attention to the same and told him he thought it ought to be timbered. That the place in fact did need timbering, and it was the defendant's duty, and the shift boss' duty as defendant's agent and representative, to see to it that it was timbered, and it could have been timbered with little cost and expense, and the danger of plaintiff's being injured by rock falling from it could have thus been obviated and avoided. That the shift boss examined the place and told the plaintiff that it needed timber and he would send the timbermen to timber it either that afternoon or the next day and told plaintiff and his partner, who had been barring down loose rock from this belly, not to bar down any more from it because they would make more fall. That this belly was not timbered on Friday afternoon, but the shift boss again examined it on the next day (Saturday), spending 10 or 15 minutes in examining it. That the plaintiff did not work in the mine from the Saturday evening quitting time (that is, 6 o'clock p. m.) until the following Monday night, when he and his partner went to work and went into this stope and found their drilling machine near the place where they had been working on Friday and Saturday (that is, the squaring up place) and found that the work of squaring up had been completed, and that, while they were gathering up their tools and waiting for him, the shift boss came and told plaintiff and his partner they would have to go down to the point (that is, to the place at the first stope whereat plaintiff was when injured). That the plaintiff again spoke to the shift boss and told him that this belly looked bad and asked him to have a look at it, and the shift boss thereupon told the plaintiff that the place was all right and that he (the shift boss), would have it timbered as soon as possible, or words to that effect, and told plaintiff to go on down to the point and go to work and that he would be all right; that nothing would fall from the belly.

"That the plaintiff relied upon these promises and assurances from the shift boss and believed therefrom, and from the appearance of the belly, that he could safely work at the point until the place would be timbered, and because thereof, he went down to the point with his partner and went to work in a careful and prudent manner. That they set up their drilling machine and plaintiff was just starting a hole with a pick and had been working for a few minutes when a chunk of stone or rock from the belly fell therefrom and rolled down to the place where plaintiff was working (that is, to the point) and struck the machine and post and dragged them down the level and struck plaintiff and broke, crushing and injuring his leg and arm and internally injuring him, and ruptured him between his legs and otherwise injured him.

"Now, gentlemen, these are the claims of the plaintiff that because of these facts the defendant was guilty of negligence in conducting its business, and that because of such negligence the defendant ought to be held to compensate him for the injuries he received in the accident that occurred. The defendant, on the other hand, denies it was guilty in conducting its business, and denies the evidence shows it neglected any duty it owed the plaintiff, and alleges the fact that it carried on its business in a careful manner and did all the law requires, and denies that it should be held liable for the injuries that the plaintiff received. The defendant also claims that the plaintiff assumed the risk of working in the place where he did work, he having known that the ground in question was poor ground, and claims that under his evidence it was shown that he assumed whatever risk there was in his going to work at the place he was working when the accident happened. The defendant also claims that in any event he was guilty of contributory negligence in working as he did, under the circumstances he did, and that in any event they should not be held liable in this case. Now, gentlemen, that will be the question for you to determine. I might say in this case, as all others, you are the sole judges of the facts. I pass upon the law and you take the law as I give it to you. You take the law and apply it to the facts and find whether the

plaintiff has maintained his cause of action by a fair preponderance of the evidence.

"I charge you that if the place where plaintiff was working at the time of the occurrence of his injuries was in an unsafe condition for him to work in by reason of the fact that rock was liable to fall or roll from the belly in question, and the belly could and should have been timbered by the defendant so as to prevent the falling or rolling of such rock, and the shift boss was a person to whom the defendant had intrusted the duty of looking after and timbering such place and causing the same to be timbered when necessary, and the plaintiff complained to the shift boss of the danger arising from the fact that the belly was untimbered and suggested or asked that the belly be timbered, and was asked, ordered, or directed by the shift boss to go to work at the place where he was injured, and if the plaintiff reasonably believed that he could work at such place mentioned with safety until these promises or assurances of the shift boss were fulfilled, then the plaintiff would be excused by the law in going to work and remaining at work at such place for a reasonable time thereafter to await the putting in of such timber, and he would not be deemed to have assumed the risk of injury by rock falling and striking him, owing to the want of such timber at such time, unless the danger was so imminent or glaring that a reasonably prudent man would not even after such promises and assurances and order or direction of the shift boss, incurred by entering and continuing the work as plaintiff did. * * *

"I charge you further, a reasonable time for plaintiff to so work awaiting the fulfillment of an assurance or promise that the belly would be timbered would be such a period of time after the time of making the promise or assurance, or promises or assurances, that the same would be timbered, as would preclude a reasonable expectation on plaintiff's part that the promise might be kept, or, stated in another way, it would be the time which would elapse while the plaintiff was expecting the promise to be performed. If the plaintiff was in doubt as to the safety of the place where he was working at the time he was injured, and the plaintiff believed the shift boss knew

better than he as to whether or not it was safe, and the shift boss assured plaintiff that the place was not unsafe, it would not be contributory negligence on plaintiff's part to be guided by the opinion and assurance of the shift boss.   *   *   *

"The plaintiff was not guilty of contributory negligence if at the time of the occurrence of his injuries he was using and exercising ordinary care and prudence in performing his work, having regard for the situation in which he was working, and was conducting himself the same as a person of ordinary care and prudence would have conducted himself under the same or similar circumstances. He was only required to use and exercise ordinary care, and, if he did that, then he was not guilty of contributory negligence. If you find that the plaintiff knew or believed that the hanging wall was in a dangerous condition, and that in his judgment as a miner he knew or believed that the hanging was poor, as he expressed it, or if you find that from his experience, or from what the shift boss told him, or from his own observation or sounding, he believed or should have known that the hanging was likely to fall from the place where it did fall, even though he could not tell when it would fall, then I charge you that the risk of injury was one which he assumed, and your verdict must be for the defendant.

"If you find that the plaintiff knew or believed or had reason to know or believe that the hanging was liable to fall from where it did fall, and that nevertheless he went to work without objection under the place which he himself considered unsafe, even though he may not have known or believed that the rock would fall so soon, then plaintiff would be guilty of contributory negligence, and your verdict must be for the defendant.   *   *   *

"It was the duty of the defendant to furnish plaintiff a reasonably safe place in which to do his work. I charge you that a person entering or going into a dangerous place assumes all risk of injury which an ordinarily careful and prudent person might apprehend is liable to happen under the circumstances. There is no liability for an injury inflicted upon one person by another, although the injured person be free from fault, if the cause of the injury be unusual

and one which reasonable and careful foresight could not have foreseen and guarded against.

"In this case I charge you that the defendant is not an absolute insurer or guarantor of the safety of its employees. Its duty was only to exercise due care in this regard, such care as an ordinarily prudent person would exercise under like circumstances. If it exercised such care, then it cannot be held liable. In furnishing a safe place, the place is to be considered with reference to the nature of the employment. We recognize the fact that some employments in their very nature are more dangerous than others. The question in this case on this subject is.: Did the defendant furnish the plaintiff a reasonably safe place in the mine?

"I charge you, gentlemen, the mere fact that an accident happened does not justify you in rendering a verdict against the defendant. That is not sufficient. The plaintiff must show to your satisfaction, by a fair preponderance of the evidence, that the accident happened, and that it was the result of negligence' on the part of the defendant. He must show still further that he himself was not guilty of any negligence which contributed to the accident in the slightest degree. If he was guilty of any such negligence, then he would be guilty of contributory negligence, and that would bar him from recovering. Therefore, gentlemen, it is necessary that the plaintiff prove to your satisfaction, by a fair preponderance of the evidence, that this accident happened as a result of the negligence of the defendant, and that he himself was free from any negligence which contributed to the accident (that is, any negligence which contributed in the slightest degree to the accident) before he is entitled to recover at your hands.   *   *   *

"I charge you further that the plaintiff, in the discharge of his work as a miner, is obliged to exercise care for his own safety. If he failed to do so and any negligence on his part contributed in the slightest degree to his injuries, he would be guilty of contributory negligence, and that would bar plaintiff's right to recover, even if the defendant itself was guilty of negligence."

There was much more of the charge, but we have

quoted all of that part of it to which objection is made.

Complaint is made of various portions of this charge and particularly to that part relating to the claim of the plaintiff. Counsel say:

"This portion of the charge reads very much as if it were based upon a request submitted by the plaintiff. Taking these claims as stated by the court, as they read in the portions of the charge covered by the assignments of error, and even more strongly if read in sequence as they occur in the charge, they are distinctly in the nature of an argument in favor of the plaintiff, and our main objection to it is that it is argumentative. This is quite likely to be the case where it is attempted to state, as in this charge, the claims of the plaintiff with regard to the facts in detail."

A careful reading of the charge does not satisfy us the criticism is justified. The judge undertook to state the claims of each of the parties. Perhaps the charge states them more in detail than was necessary, but the judge was careful to say to the jury:

"I might say in this case, as in all others, you are the sole judges of the facts. I pass upon the law and you take the law as I give it to you. You take the law and apply it to the facts and find whether the plaintiff has maintained his cause of action by a fair preponderance of the evidence. * * * You are the judges of the weight of the evidence. You will give the evidence such weight as in your judgment you feel it is entitled to, and if, after doing so, you feel that the plaintiff has established his case by a fair preponderance of the evidence, then you will find a judgment in favor of the plaintiff. * * * If, on the other hand, the plaintiff has not maintained his cause of action by a fair preponderance of the evidence, then proceed to render a verdict in favor of the defendant, and in that case the form of your verdict will be, 'We find for the defendant.' "

Errors are assigned on the admission of testimony

in relation to what was said and done by Capt. Innes, who plaintiff claims was the boss of the underground workings. We again quote from the brief:

"The objections were overruled and the witness gave the answers which have been heretofore quoted in this brief.

"In the case of *Toomey* v. *Steel Works*, 89 Mich. 249 [50 N. W. 850], this court held as follows with reference to testimony of a similar nature:

" 'The failure of plaintiff to produce such proof of negligence is not excused by showing that the foreman assured him that the frame was properly secured. Even if the foreman were the defendant's vice principal, he could not bind the defendant by such a statement, if the danger was as apparent to plaintiff as to him. * * * An agent is not by the law clothed with power to make such representations, and bind his principal to respond in damages if injury results.'

"On this principle thus laid down by this court the testimony of the plaintiff in this regard was incompetent and the objection should have been sustained."

We shall have occasion to consider later the principle of law thus invoked.

Counsel say the court erred in permitting leading questions, citing:

"You may state whether or not you believed you could work there safely until it was timbered.

"You may state whether or not, after the shift boss told you that nothing could fall and to go down there and that he would timber it, you believed you could work safely down there until it was timbered.

"After having been sent down to the point by the shift boss on Monday, did you think that belly would come down on you?"

—and says they are examples of numerous infractions of the rule. The record indicates the plaintiff was not well versed in the English language and part of the time his testimony was given through an interpreter.

We do not think it can be said the court abused the

discretion possessed by him in regard to permitting leading questions. See *Mason* v. *Patrick,* 100 Mich. 577 (59 N. W. 239); *Lungerhausen* v. *Crittenden,* 103 Mich. 173 (61 N. W. 270); *Webb* v. *Feather's Estate,* 119 Mich. 473 (78 N. W. 550); *Burnham* v. *Insurance Co.,* 119 Mich. 588 (78 N. W. 653); *Burnham* v. *Insurance Co.,* 120 Mich. 499 (79 N. W. 1124).

We now come to the important question in the case. It is stated by counsel as follows:

"A verdict should have been directed in favor of the defendant upon the evidence given by the plaintiff, which was the only evidence in the case relating to the circumstances of the accident. While there are other errors which occurred on the trial, upon which defendant relies for a reversal of the judgment in favor of the plaintiff, the main question to be submitted to this court is whether, upon the evidence of plaintiff himself, any cause of action was established which would entitle the plaintiff to recover damages against the defendant. It is of course conceded that the evidence in the case must be viewed in its most favorable aspect to the plaintiff.   *   *   *

"(1) The plaintiff, having full knowledge of the situation and of the danger existing, assumed the risk of injury when, without protest, he went to work under the belly on the night of the accident.

"(2) The plaintiff was guilty of contributory negligence because, without protest, he went to work on the night of the accident with full knowledge of the existing conditions and with full appreciation of the danger therefrom.

"(3) Because there is not sufficient evidence to charge the defendant with negligence with respect to plaintiff, having in view his position and duties in the mine."

In support of his contention, counsel cite 26 Cyc. pp. 1209 to 1213, *Toomey* v. *Steel Works,* 89 Mich. 249 (50 N. W. 850), and other authorities.

It is manifest that, to pass intelligently upon the propositions of counsel thus stated, it is necessary to

quote somewhat fully from the material parts of the
testimony of the plaintiff, which we do as follows:

"I had worked in this same stope six months and
a half altogether. This belly had been in sight where
we could see it about a month. We took the ground
out from under that belly, me and my partners, and
the other shift men also. We had worked beyond
that until we got up in the arch. I don't remember
positively if it was about a month before we were
hurt that the ground under that belly was taken out,
but it was at least a month. After we had taken the
rock away from under we suspect it was dangerous.
We thought for a whole month and perhaps more
that the belly was dangerous ground. We tried to
take it down, to pinch it down. We couldn't do it.
We still considered it dangerous for that whole
month. * * * What made me think that belly
was dangerous I have sounded with the bar. It gives
a dangerous sound. It sounds to us. It did sound
that showed it was dangerous. We got that sound
that indicated it was dangerous a month or more be-
fore I got hurt. We suspect it. We thought it was
dangerous. We thought it was going to come down
some day. The part of the belly that was so dan-
gerous as I remember, and I thought was going to
come down, was about the middle. I didn't think that
any part of it would come down. It meant that the
whole of it might come down. I don't remember how
often we used to sound it, whether we would sound
it more than just that one time. It was within a
month's time before I was hurt. The shift boss
sounded it Friday before I was hurt. We sounded it
the same time. I held the lamp and I think that the
shift boss had the lamp on his hat also. I sounded it
myself. We thought it was dangerous the way it
sounded, but the shift boss told us it wasn't danger-
ous so we believed him. My partner and myself
thought. Ristvedt thought it was dangerous too. It
sounded dangerous to me. That was on Friday. I
had not sounded it between the time, a month before
that, and that Friday that I remember. The reason
we didn't sound it was we thought it will stay up
there.

"*Q.* Now let me understand that. When you

sounded it a month or more, or about a month before you were hurt, you thought it was dangerous and was likely to come down at any time. That's what you told me, didn't you?

"*A.* We didn't sound it.

"*Q.* Didn't you sound the hanging, that hanging, that belly, a month before you were hurt, or about a month?

"*A.* We sound it elsewhere.

"*Q.* Didn't you tell me a little while ago you sounded that belly?

"*A.* We didn't sound the belly but we sounded other places on the belly.

"*Q.* That would be to find out whether the belly was solid or not?

"*A.* Yes.

"*Q.* And in that way you found out that the middle of the belly was bad?

"*A.* Yes.

"*Q.* Now, having found it bad a month before, I ask you again if you didn't sound some more between that time and the time you were hurt?

"*A.* I don't remember.

"*Q.* But all that time you thought it was going to come down some day?

"*A.* We thought so.

"*Q.* By 'we,' whom do you mean?

"*A.* My partner and myself.

"*Q.* You both thought the same?

"*A.* Yes. We didn't think that all the time from the time the belly was first exposed. Sometimes we thought of it. When we did think of it we thought it was unsafe, dangerous, and was going to come down some day. We gave notice to the opposite shift that the hanging looks poor. We told them at the belly. I don't remember how long before we were hurt that I gave notice to the opposite shift that the place was dangerous, but we had some talk some time. It was some time in that month from the time the belly was exposed up to the time I was hurt. I don't know if it was two or three weeks before I was hurt. I don't remember if it was before the Friday that I told about. I don't remember more than one time giving them notice that the belly was dangerous. We told them so they knew how to look out for them-

selves. That was because we thought it was danger-
ous and was going to come down. My recollection is
that my partner wrote a letter, a short letter, and left
it down in the mine on a powder box, stating, 'Look
out, the hanging is dangerous.' That powder box was
on the third level. It was in the level, not in the stope.
That was about 300 feet in from the shaft. It was
pretty near in to this stope. My partner wrote that
letter in English. It said, 'The hanging looks poor;
look out for it.' It was a part of the same belly. He
said that in his letter. I recollect that he did say. It
seems to me that it was the right thing to do to get
up that letter. That's what I thought at that time.
I thought that because I really believed that the belly
was dangerous and was going to come down if we
didn't look out for it. That's just what I mean. It's
so long time passed since that happened that I can't
tell about how long that was before I got hurt, but
it seems to me that it was during that month.   *   *
*   We went up through that hole to get to the third.
By through that hole I mean the hole to the north
of where we were working. This other hole that I
told about was almost to the corner which we squared
up. About 15 feet from that corner north. We made
that hole Friday before dinner. Previous to that the
dry hole was drilled in there. He put the hole
through then the Friday morning. The shift boss,
when he came down, he told us to put one hole in
there and blast before dinner, so as to make the open-
ing through. He said it would be good to put the
timbers through that into the belly that was in the
stope. The hole was for that. That was what it was
for. That hole was about three feet long. The men
could go through all right. Just about big enough for
a man to go through. By timbers for that belly I
mean for this same belly that we have been talking
about. The shift boss says it was poor and he says
that he was going to put timbers in there, four tim-
bers. That was Friday when he said that. We
thought it was poor because he also said it was poor.
We knew it was going to come down some day. We
thought so Friday, because he says that it was to be
timbered. We thought so before Friday. We didn't
know that it was dangerous before we were told; we
more or less thought so; but when he said it himself

that it was so we believed him for the reason that he had been working in the mine for 20 years. We thought after he said it was poor we were even more sure that it was going to come down. We were even more sure after he said it was poor than we were before. We thought it was good ground, but we have a right whenever there is a poor place, or we think the place is poor, to notify the shift boss, call his attention to it, so that he will fix it up. We didn't have so much experience as the shift boss, and we had a right to tell him about it, and we did tell him about it one month or more before I was hurt, we thought that was poor ground. That was my judgment as a miner, and my partner's judgment. We didn't speak to Capt. Innes about it until Friday before the accident. We thought he knew that himself. It didn't look so very bad, but appeared somewhat bad. We thought he would see it; that's the reason we didn't tell him because it looked so bad we thought he would see it himself, and he knew more than we did.

"*Q.* Now, won't you answer my question directly, without telling what you thought Capt. Innes knew, or anything about it? I will repeat the question and ask you to answer it without talking about Capt. Innes. You and Ristvedt thought it looked so bad that you felt sure the captain would see it without you telling him?

"*A.* We thought so.

"*Q.* And that's the reason you didn't tell him?

"*A.* Yes, that's the reason. The first time it was spoken about between us and Capt. Innes was Friday before the accident. He did see that Friday morning, and he asked me, 'How is that hanging?' and I told him, 'It looks poor.' The way I said it in English to Capt. Innes was: He said, 'How that belly over there, that belly look?' I said, 'That look kind of poor,' I said—and he went to look. He take the bar; he try that. He said, 'That look poor.' When he tried it with the bar I thought it was poor. It sounded poor to me, and he said that poor. That was Friday morning. Saturday I said I didn't sound it. We thought all day Saturday that it was poor. * * * *"

On the redirect examination he testified:

"The night of my injury we had been working in the upper stope there an hour and a half altogether. Previous to that night we had been working in the upper stope three months and a half. The day of my injury this belly I have mentioned had been undermined about a month. After the rock was taken out from that belly we worked above the belly up to that Monday evening. That is the Monday evening of my injury. During that time in going to my work we were going by the third level through that hole. When we went that way to my work we would not be required to walk under the belly. The working place was above this belly.    *    *    *

"Q. After having been sent down to the point by the shift boss on Monday, did you think that the belly would come down on you?

"A. No."

On the recross-examination he testified:

"Monday night we sounded the belly before Capt. Innes came. It sound poor to us. By that I mean the sound we got by hitting it with the bar. We thought it was what we call poor ground, poor hanging. When we had this talk with the trammers the trammers were in the stope then. It was before we talked with the trammers that we did this sounding. When we talked with the trammers and told them that the ground was poor and they said they could see it was poor, we had already sounded it. That was about 8 o'clock Monday night. We went underground Monday night at 7 o'clock, leave surface at a few minutes to 7, and get down to our work at 7. It was near 8 o'clock that Capt. Innes came. I don't remember just the time. It was after we had talked with the trammers. Capt. Innes was on the third level. He talked to us from that hole. But he stayed up on the third level and just talked to us down through the hole. He was kneeling down partly looking down through the hole and talking to us. He would be six feet up from us.    *    *    *"

In addition to the authorities already mentioned, counsel say:

"The principle with reference to the effect of a

promise of the employer to remedy the defect is thus stated in [4] Thompson on Negligence, § 4666:

"'On the other hand, the employee is deemed to accept the risk, notwithstanding the promise of the employer to repair the defect, (1) where the danger is great, obvious, and immediate —such as a reasonably prudent man would not encounter.'

"A number of cases are cited in the margin and we have failed to see anything which raises any doubt as to the proposition in any jurisdiction."

In construing the testimony of the plaintiff it should not be forgotten that, for a month after the removal of the pillar under the belly, plaintiff was at work above this point, where he would not have been injured had the rock fallen. While he thought it dangerous and so notified Capt. Innes, still the rock had not fallen, and it was not until he had been assured by the captain that he went to work where the injury occurred.

In *Brouseau* v. *Supply Co.*, 158 Mich. 312 (122 N. W. 620, 27 L. R. A. [N. S.] 1052), it is said in part:

"If the employee, after notifying the employer of a dangerous defect, is induced to continue his work by the employer's promise to remove the defect, his implied contract to assume the risk of such defect is suspended for a reasonable time, and the employer impliedly contracts to assume the risk of injury therefrom himself. Regarding the employer's promise to repair as a temporary assumption of the risk on his part, it appears to us illogical to hold that the employee is no longer charged with the *obvious* risks of a complicated machine, but still assumes the *obvious* risks of a simple implement. We deem it more in accordance with the principle upon which the doctrine of assumed risk rests in this State to hold that it applies alike to simple tools and complicated machinery. See 1 Labatt on Master and Servant, pp. 1223, 1224; *Louisville Hotel Co.* v. *Kaltenbrun*, 26 Ky. Law Rep. 208, 669 (80 S. W. 1163, 82 S. W. 378) ; *Roux* v. *Lumber Co.*, 85 Mich. 519 (48 N. W. 1092, 13 L. R. A. 728, 24 Am. St. Rep. 102) ; *Lyttle* v. *Rail-*

*way Co.,* 84 Mich. 289 (47 N. W. 571) ; *Brown* v. *Lennane,* 155 Mich. 686 (118 N. W. 581 [30 L. R. A. (N. S.) 453].

"We do not think it should be held, as a matter of law, that the directions of the master's representative did not amount to a promise to repair, upon which the plaintiff had a right to rely. Neither can it be affirmed, as a matter of law, that plaintiff was guilty of contributory negligence without entirely depriving him of the protection afforded by the master's temporary assumption of the risk. It is clear that, if the mere use of the dull tongs under the surrounding circumstances of peril constituted contributory negligence, the rule absolving plaintiff from the assumption of the risk which his employer had agreed to assume for the time being would be wholly valueless, since the rule only applies where the danger is not so imminent that an ordinarily prudent man would not assume the risk itself. *Mann* v. *Railway Co.,* 124 Mich. 641 (83 N. W. 596).

"If plaintiff was guilty of contributory negligence, therefore, it was because he went on using the dull tongs which the employer requested him to continue using. According to his testimony, he used them with proper care, in reliance upon the orders and promises of his employer.

"The plaintiff, 'it may reasonably be assumed, would to some extent have his fears allayed by the commands of a master, whose duty it would be not to send him into danger, and who might therefore be supposed to know, when he gave the command, that the dangers were not such or so great as the servant had apprehended. * * * Moreover, the assurances remove all ground for the argument that the servant, by continuing the employment, engages to assume its risks. So far as the particular peril is concerned, the implication of law is rebutted by the giving and accepting of the assurance; for nothing is plainer or more reasonable than that the parties may and should where practicable come to an understanding between themselves regarding matters of this nature.' Cooley on Torts, pp. 556, 559, quoted with approval in *Roux* v. *Lumber Co., supra.*

"It is difficult to believe that any employer would induce an employee to continue a service which he

believed would probably result in his serious injury. It is obvious that the plaintiff believed that, notwithstanding the apparent danger, he could escape injury in continuing his work. He had used the tongs without injurious results from their slipping up to the time of his injury.   *   *   *.

"In the light of the testimony as to the results attending the use of the tongs before and after the plaintiff's injuries, I do not think that it should be determined, as a matter of law, that the danger was so imminent and great that it was sheer recklessness on the part of the plaintiff to obey the directions of his employer, relying upon his assurances.

"The judgment is reversed, and a new trial granted."

The language used in *Runians* v. *Keller & Brady Co.*, 141 Ky. 827 (133 S. W. 960), is germane here:

"This is a case in which the master and servant both knew that the roof had not been scaled, and wherein the master, in the presence of the servant, examined the roof, assured the servant that it was safe, and directed him to remove the *debris* before scaling the wall so that an approaching train might pass. The general rule is that when a master directs an employee to enter a dangerous place to labor and the employee complies with that order and is injured, he can recover from the master, unless the danger was so obvious and imminent that an ordinarily prudent person would not have undertaken the work, even though ordered by his master to do so. This is a question for the jury to determine. *I. C. R. Co.* v. *Edmonds,* 33 Ky. Law Rep. 933 (111 S. W. 331). In the case of *Pullman Co.* v. *Geller,* 128 Ky. 72 (107 S. W. 271, 32 Ky. Law Rep. 884, 129 Am. St. Rep. 295), this court, in speaking of the rule that obtains when a servant of his own volition enters a place to work knowing the danger, said:

" 'This rule must, however, be applied with some modification, if the work is done in an emergency and by the direction of the master, or by his express command in the absence of an emergency, and the master gives the servant to understand that he does not consider the risk one which a prudent man would refuse to undertake, in such event the servant, notwith-

standing his knowledge of the danger, has a right to rely on his master's judgment, unless his own is so clearly opposed thereto, that, in fact, he does not rely upon the master's opinion.'
* * *

"In the case of *Stephens* v. *Railway Co.*, [96 Mo. 212] 9 S. W. 591 (9 Am. St. Rep. 336), the court said:

" 'So, too, where the danger is patent and is known to the servant, the master may be liable for injuries resulting therefrom, as where he has lulled the servant into a sense of security by insisting there is no danger or has promised to remove the defect. Wood on Master and Servant, § 352. And, more to the point in this case, a recent text-book uses this language: "If, therefore, the master orders the servant into a situation of danger, and he obeys, and is thereby injured, the law will not deny him a remedy against the master on the ground of contributory negligence, unless the danger was so glaring, that no prudent man would have entered into it, even where, like the servant, he was not entirely free to choose." '
* * *

"The Nebraska court, in the case of *Chicago, etc., R. Co.* v. *McCarty*, 49 Neb. 475 (68 N. W. 663), announced the rule, which is a reasonable one, to be as follows:

" 'Our conclusion after a consideration of the subject is, that it is a harsh and unreasonable rule which charges a servant, when commanded to perform an act by his master, with the duty of at·once determining whether or not the act can be safely performed, and then performing it at his peril, or refusing to perform it at the expense of losing his employment. The risk incurred by obeying a negligent command of the master is not one ordinarily incident to the servant's employment, and is not an assumed risk, because negligence on the part of the master is not presumed to be a feature of the employment.
* * *'

"In Shearman & Redfield on Negligence, § 186, we find the following:

" 'The true rule in this, as in all other cases, is that, if the master gives the servant to understand that he does not consider the risk one which a prudent person would refuse to undertake, the servant has a right to rely upon his master's judgment unless his own is so clearly opposed thereto that, in

fact, he does not rely upon the master's opinion. So, if the peculiar risk of the act commanded by the master is not obvious, the servant has a right to assume that he is not sent into any unusual peril, and he. is not bound to investigate into the risk, before obeying his orders. A servant is not called upon to set up his unaided judgment against that of his superiors; and he may rely upon their advice and still more upon their orders, notwithstanding many misgivings of his own. If the master directs the servant to do some act which is dangerous, but which could be made less dangerous by the use of special care on the part of the master, the servant has a right to assume that such special care will be taken, and does not take the greater risk upon himself. If the master calls suddenly upon the servant under circumstances which give no time for consideration, * * * he is bound to indemnify the servant for injuries sustained through obedience to such a call. The servant's dependent and inferior position is to be taken into consideration; and if the master gives him positive orders to go on with the work, under perilous circumstances, the servant may recover for an injury thus incurred, if the work was not obviously so dangerous that no man of ordinary prudence would have obeyed.' "

Many other authorities to the like effect may be found in the brief. In the instant case it is a fair inference from the testimony that, while the plaintiff regarded the hanging wall as so dangerous as to need timbering to make it safe, he did not regard the danger as so immediate as to justify him in disregarding the assurance and the direction of his superior. The questions presented by the record could not properly be withdrawn from the jury.

Judgment is affirmed.

STEERE, C. J., and MCALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.